The first case in the docket this morning is 523-0196, Colbert v. Colbert, for the appellant, Heather Dabler, for the appellee, Charles Forby. Good morning, are you guys ready? I should be. As you can see, we are joined by Justice Cates via Zoom today, and she'll participate. This is us who are sitting here, so you can begin when you're ready. May it please the Court, Justice McKinney, Justice Barberis, and Justice Cates. I am Heather Dabler, and I'm here for the appellant, seeking to overturn Judge Foley's ruling from February of last year, denying our request to terminate a spousal support to the appellee, Stacey Colbert. I know that the Court is well-versed with the facts, so I will start with the law. As the Second District has previously stated in Ray of the Marriage of Sunday, 289-860-2004, each case seeking a termination of maintenance based on the recipient spouse's conjugal cohabitation rests on its own unique set of facts. And this case does present a unique set of facts. In many of the cases that are cited by the appellee, and as the Court could find through their research, the issue of cohabitation turns on that six-factor test inherent. But I would say in Ray of the Marriage of Miller, in addition to the six-factor test that's up forth in our brief, in Ray of the Marriage of Miller also stated, in distinguishing an intimate dating relationship from a marriage-like relationship, it is fair to state the following. Intimate dating relationships have companionship and exclusive intimacy. The former spouse does not engage in similar relationships with the third person. They also have a deeper level of commitment, intended permanence, and financial or material partnership, which most commonly comes in the form of a shared household. In this case... Let me stop you there. Yes, sir. One of the factors that you just read off from Miller is intended permanency. Yes, sir. And where is that in this case? In this case, Your Honor, they were in a committed relationship for three years. In fact, Ms. Colbert was served with summons at the Paramours' house. Shortly after, approximately a month after she was served with the petition to terminate, she testified that the relationship had ended. But you cannot fix a defect that occurred at the time of the filing of the petition. The case law is very clear that once you begin to cohabitate, the cohabitation ends your maintenance. You cannot do anything to fix it afterwards. In this case, if I answered your question, Justice Barberis, in this case, why we believe that in addition to the six-factor test inherent in Miller, there is a commonly shared household, was the number of times that the private investigators had seen or videotaped Ms. Colbert at her boyfriend's residence. She got mail at her boyfriend's residence. She filed a worksheet with the clerk of the courts listing her romantic partner's address as her permanent residence to receive her maintenance and spousal support payments. She listed her boyfriend's residence as her legal residence for tax purposes. She changed her address to her boyfriend's residence on her bank statements. She changed her address with her employer to her boyfriend's residence. As indicated by the transactions listing, the exhibits in the bank account, she spent more than half of her monthly maintenance payments in the Roxanna, Illinois area, which was 50 miles from where she purported to live. Also, in addition to your question, Justice Barberis, about the permanency, even though she testified at trial that she had a residence in Waterloo as of February or March of 2023, excuse me, 2022, she didn't have a bed there for two or three more months. It sort of defies logic that the place you're living, you don't have a bed in, you don't spend your money there, you don't spend your time there, and you have all of your mail sent to your boyfriend's address. In fact, she… She had someone living with her at that address. Is that correct? The partner's daughter, Your Honor, did live in the Waterloo address once it was rented. And how old was she at that time? She's an adult, Your Honor. All three of the children were emancipated. Younger than 20s, if I had to give an exact age. Another part factor, she testified that she had full access to his home. She could come and go as she pleased. She grabbed mail out of the mailbox. She testified as to their vacations together. Was there any testimony from the daughter that purportedly lived with her? No, Your Honor, none of the daughters testified. And although Ms. Colbert had indicated she lived with her parents, none of her parents testified, the daughter did not testify. No one besides the parties and the private investigators testified at trial, Your Honor. And just briefly, I would touch on the six-part test. Excuse me. The relationship did last a minimum of almost three years. And it's convenient that it ended after she was served with the petition to terminate maintenance. As indicated in the court file, the petition to terminate maintenance was served upon her at Jody Shore's residence, her boyfriend's house. She testified that they spent a number of nights together. Every time the private investigator followed her to her employer, she either came or went from her boyfriend's residence. Her bank account showed the numbers of transactions. She took a COVID test from the Wood River Walgreens in order to return to work. I believe, Your Honor, the most telling factors in the living together are the steps that she took to change her permanent address. As I've already said, she filed a paperwork with the court saying her permanent address to receive her maintenance payments was Mr. Shore's residence. If you weren't intending to live there permanently or stay there, no reasonable person would change your residence on all of that legal paperwork. I do want to touch on the nature of activities engaged in. There was a lot of evidence that they spent a lot of time entertaining holidays, family celebrations. They went to each other's children's college graduations together. They took pictures together. Stacy admitted that many of her bank accounts were for shared meals with Jodi. They took turns paying. She put their entire Florida vacation around her credit card. Would you say that again? She said that her bank account was used for? For paying for meals. Okay. It's not a shared account, though. It is not a shared account, Your Honor. Was there an intent to marry her? Your Honor, there was no testimony that there was an intent to marry. Is that a factor against a de facto marriage? That is one of the factors, and the court looks at the totality of the circumstances. And a lot of the cases do say the reason for the continuing cohabitation in the statute is so people don't live in this de facto husband and wife relationship, but don't exchange rings, don't exchange vows. I think the permanency was they were in a relationship for over two years. She moved in with them. She lived there for four months. We filed, my client filed a terminate. She can't correct that after the fact. I believe Ms. Keller, you pointed out that there was no, neither party had keys to the other party's residence or anything of that nature. Is there any reason for that? Yes, Your Honor. If you were to look at what I cited in the transcript, Ms. Colbert testified that she went in and out of Mr. Short's residence without a key because he didn't lock it. So she didn't need a key because the doors were never locked. She didn't have a legal residence besides his residence from November of 2022 until arguably maybe March of 23. So there would have been no reason for Mr. Short to have a key to her residence. The other thing that weighs in factor of a marital-like relationship, she admitted that they drove each other's cars, that when Jody's car was being repaired, Jody was driving Stacy's mother's truck. And so that's kind of intermingling of that familial relationship. And I wanted to point something out about the attorney's fees as well. The party seeking attorney's fees in a dissolution of marriage proceedings must show two things, and that's one, inability to pay and the demonstration of the other spouse to do so. That's in-ray marriage of Keevee, 219 Ilbeck, 274 5th District, 1996. And the party requesting fees has the burden to demonstrate the inability to pay, and that's in-ray marriage of Snow, Appellate, 4th District, 1996, 214 Ilbeck, 651. Mr. Courtney states in his brief that the local court rules require Mr. Colbert to file a financial affidavit. I disagree. The local court rule specifically says that if the issues of support and property division are at issue, then the court requires you to file a financial affidavit. The amount of support was not an issue in this case. The issue was, was Ms. Colbert cohabitating or was she not cohabitating? There was nothing in the local court rule that requires the filing of a financial affidavit. Well, I have a question about the financial affidavits. In Mr. Courtney's brief on page 8, the second line says the trial court had the financial affidavits from both parties as well as the pay information from both parties. But then down at the bottom of page 8, second line from the bottom, it says Roger chose not to admit his financial affidavit into evidence. The court had those or did not? There was never a financial affidavit, Mr. Colbert, Your Honor. Okay. Mr. Courtney had subpoenaed Mr. Colbert's pay stubs and information from Ameren, so that was available. His current pay was available. But I do not believe that the local court rule requires the filing of a financial affidavit because it says it's a pleading seeking to establish, modify, or otherwise affect maintenance and division of property. The court is not asking it to be modified or changed in any manner, so I don't believe that Mr. Colbert's finances is relevant for that, and I don't believe there are any findings of the court finding that Ms. Colbert did not have the ability to pay or that Mr. Colbert had the ability to pay, and that is her burden. I think that's all. Ms. Stadler? Yes, Justice Cates. In Judge Foley's order where he made certain findings about the bank accounts and the real estate, was there any error in paragraph 6 of his findings that you disagree with? I agree with Judge Foley that there were no, they did not have joint bank accounts, nor did they own real estate together. However, there was a significant commingling of funds based upon the number of transactions that I had questioned Ms. Colbert about in court. It was Dairy Queen, the pizza places, restaurants, and I had questioned, you're telling me it cost you $37 to eat at Dairy Queen? Well, no, I paid for him. Well, okay, well, when did you pay for him and he paid for you? Well, I don't know. So I do think that there was some commingling. She testified he bought her a tire. There was some other evidence. She did put their entire vacation in her bank account that came through. She said he paid her back in cash. There was a Venmo transaction where he said he paid her $200 for a couch, but she couldn't remember. So there was a lot of money going back and forth. That wasn't necessarily either one of them paying for themselves. But I agree with Judge Foley that, yes, there was no joint accounts or real estate. Okay, thank you. Thank you. Okay, thank you. You'll have time to reply. Good morning. Good morning. Good morning. Okay, please report, counsel. I want to address two things. First, Judge Barbera, you are correct. My brief was wrong. Okay. Mr. Colbert. No, Mr. Colbert did not file a financial affidavit. That was an error in the brief. I do think under our rules when support or property are at issue, the affidavit must be filed. The petition for attorney's fees was filed well in advance of the hearing. We all knew what the standard was for the review. Mr. Colbert, for whatever reason, chose not to file that financial affidavit. So what Judge Foley was left with was my client's financial affidavit and Mr. Colbert's income and earnings. So I think his decision on the fees was appropriate on the evidence that was submitted to him. With regard to a question that was asked earlier about intent to marry Judge McHaney, there is no evidence in this record of any intent to marry. With regard to the issue of permanence, again, my client didn't live with this gentleman from sometime in November until arguably March. She was out of her home in December of 2021, had her own place in February of 2022. We submitted to Judge Foley all the receipts for the payment of her expenses on her property at her home where her daughter lived. My client testified she lived in that apartment from February on. If you read the transcript, there was some involvement with Mr. Short even after subsequent to the breakup of the parties. If you read the transcript, he was ill, and she did take care of him at one point while he was ill. It was for six weeks, right? Six weeks, I believe you're right, Judge. And there's an undertone of somehow she divined that a petition to modify maintenance was going to be filed, and she suddenly rushed out and rented an apartment. There's simply no evidence of that in this record at all. The evidence of the payment for all of those expenses is in the record. So the apartment that she had with her daughter, did her daughter contribute to any of those expenses? Judge, it's not in the record. It's not in the record. I don't believe so, but it's not in the record. When my client lost her rental property in November, when she found out in November of 21 she was losing that property, there's an exhibit that's in the record. It's basically her response to an email. This woman was not deceptive in any way whatsoever. She said, I'm going to be living part-time with my mom. I'm going to be living part-time with Jody. I'm going to stay at his place as well until I find a new place. So she did that. There was a private investigator, and again, Your Honor, you're very familiar with the record. If you read the private investigator's testimony, he can tell you every day that he tracked her to or from boyfriend's house. He can't tell you at all when he went to my mother's home. He can't tell you whether he even knew she was staying at her mother's home, even though my client provided that information. So I think at best what you have here is you have a lady who was in a two-and-a-half-year relationship, who lost her housing, changed her mail to his address. That lasted for approximately three months until she found her own place. During the entirety of the relationship, the mention of vacations, there was one trip to Florida that they both paid their own ways for. The only gift testimony in this record is the purchase of a tire. At one point for my client, there were birthday cards exchanged between the parties. We don't have any joint accounts, joint assets. Don't have joint credit cards. Don't have use of one party's credit cards by the other party. Don't have use of one's bank accounts by the other. The question asked about the key I think is a lot more important than it sounds. Jodi's door was unlocked so my client could come and go as she chose. Her door wasn't unlocked. Her door was locked, and her testimony is clear. He never had a key to any place she ever lived. It was a dating relationship. It was an intimate dating relationship. It's interesting to me when I'm up here and counsel and I are mentioning the same cases to you. These facts, these patterns are so fact-intensive and are so dominated by the facts, they're all different. But with cases like Weisbrook that we cited that talk about the main impact that the court should consider is the financial impact on the recipient of maintenance and her need for maintenance. There's no evidence in this record that Mr. Short ever at any point paid any expense on behalf of my client. There is the only testimony in the record regarding an intent to marry is by my client because her former boyfriend did not testify. He was not subpoenaed.  So that is the evidence in the record. What was Stacy's mom's address? Where was she? What town? Waterloo. Okay, and that's the apartment was in Waterloo as well? It was Waterloo, Columbia. I believe it was Waterloo, Judge. The fact that she spent in a 27-month period $32,000, almost $33,000 in the Wood River area as opposed to, or Roxanna area as opposed to, we don't have any indication of what she spent during that same period of time in the area she was supposedly living in with her mother or with her daughter. Doesn't that lend some credibility to the fact that she was living with this gentleman, Roxanna, on a permanent basis? No, I don't believe it gives credence of a permanent relationship. The records actually of what she spent in the other locations are in the record because all the bank records are in the record. These were snippets pulled out. So those other records were before Judge Foley. No, I think it shows that she had a dating relationship, and what often happens is two people go to one particular area. In this case, when she did not have a home, specifically the period of time that's recited in the brief, when she didn't have her own place, she spent more time in Roxanna. Judge, I would agree with that. I'm not going to kid you at all. I think she spent the majority of her time in his home until she got a new place in February of 22 where she could have her own residence. When you couple the amount of time based on the money spent in the locations along with the fact that she changed all of her financial records and employment records and tax records saying that she was residing with him, doesn't that also lend some weight to the fact that she was living with him on a cohabitating, semi-permanent if not permanent basis, as opposed to with her mother and whatever? She couldn't use that address for those purposes as well, right? Correct. She could have, and she chose not to. No, Judge, I think it lends credence to the fact that they had an established relationship, that it was an important relationship. The question then becomes, and we've cited those cases to the court as well, cohabitation in the abstract is insufficient to terminate maintenance, and we've cited those cases to the court. I think it's the issue of the permanent intent, the commitment to the relationship, the intent that that relationship lasts, and that simply is missing here. I am aware of the recent Rule 23, the McAllister case, that this court decided, and Judge McKinney was on that panel, and there was testimony more of the intimate nature of the relationship but the permanent nature of the relationship, what the intent was of the parties involved in that relationship, and I think that is an important factor, and that testimony belies the fact that this was a permanent move. I think the fact that she put all of her property, all of her personal possessions in storage in Waterloo until she got a new place, also lends credence to her statement that I had no intention of living with him permanently. Thank you. To touch base with regards back to the attorney's fees issue and the inability to pay, inability to pay, I do cite on page 21 of my brief, the court was provided with the income records of the parties. There was extensive testimony that although this is a pre-2019 judgment, Ms. Colbert has never claimed the maintenance payments that she's received on her state or federal income taxes, which I also think should go towards her credibility. If you were to look at Mr. Colbert's pay stub and take his net income after he's paid maintenance and Ms. Colbert's net income after she's received maintenance, she actually had $2,300 more annually than Mr. Colbert did. And that is not an inability to pay or inability to pay case. So she did get a windfall by those attorney's fees. Again, I just wanted to touch back on what... Ms. Colbert didn't make any rulings with regard to ability or inability, correct? Did not make any rulings with regards to the fees, Your Honor. Excuse me, any findings with regards to the fees. And to piggyback on Justice Barbera's what you had indicated, one of the biggest parts is Stacy could have gotten a P.O. box. Stacy could have put her address to her mother's house, but she didn't. I believe that the change of all of those addresses is not something people take lightly. If you file a tax return and the IRS has an issue, their correspondence is going to the address that you put on your tax return. So I do think that that lends to some permanency. And also, as Mr. Courtney indicated, she did have a place in Waterloo, but it's not reasonable to believe that she was living there in February when she admitted on the record that she did not have a bed there until May. As is in the record, Ms. Colbert was served with the petition to terminate maintenance while she was physically present at her boyfriend's house, and the relationship was still ongoing. So we believe the timing of the termination of the relationship to be suspect as well. We are asking the court to reverse the order of Judge Foley from February of 2023 and to mandate that the court terminate maintenance based on cohabitation. Thank you. Justice Case, do you have any questions? What is the standard of review and who carries the burden on the attorney fees? Your Honor, on the attorney's fees, the standard of review is abuse of discretion. Stacy carries the burden on the attorney's fees. Mr. Colbert carries the burden of proof on approving the cohabitation. Thank you. Thank you. Thank you. Thank you both for your arguments today and your briefs. We will take the matter into consideration as you are rolling in due course.